**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 11-cv-02568-CMA-BNB

THE WELLINGER FAMILY TRUST 1998,
JULIE WELLINGER, trustee, and individually,

      Plaintiffs,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,
a Connecticut Insurance Company,

      Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

In this insurance case, Plaintiffs The Wellinger Family Trust 1998 (the "Trust") and Julie Wellinger, individually and as trustee of the Trust, bring breach of contract and bad faith breach of contract claims against Defendant Hartford Life and Accident Insurance Company ("Defendant" or "Hartford") based on Defendant's denial of life insurance benefits following the tragic and untimely death of Julie Wellinger's husband, Jeffrey L. Wellinger ("Mr. Wellinger").  Jurisdiction is proper pursuant to 28 U.S.C. § 1332 (diversity jurisdiction).  The matter currently before the Court is Defendant's Motion for Summary Judgment.  (Doc. # 60.)  Notwithstanding the suffering Plaintiffs have endured following Mr. Wellinger's death, the Court is compelled to grant the motion, for the reasons discussed below.

# I.  <u>BACKGROUND</u>[1]

Hartford is an insurance company authorized to do business in the State of Colorado.  Hartford's principal place of business is in Hartford, Connecticut. Mr. Wellinger resided in Boulder County, Colorado, and was, at all times relevant to this action, married to Julie Wellinger.

## A.    RELEVANT INSURANCE POLICIES

Mr. Wellinger was employed formerly by STMicroElectronics, Inc. ("STM").  While working for STM, Mr. Wellinger was insured for life insurance benefits under a Hartford group policy, with a policy number of GL-675904, issued to STM as the policyholder (the "STM Policy").  The STM Policy was part of an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Under the STM Policy, STM paid for basic life insurance coverage for its employees in the amount of two times the employee's annual Earnings, up to a maximum of $750,000.  For Mr. Wellinger, this meant he had $394,000 in basic life insurance coverage while with STM.  Mr. Wellinger also elected to purchase supplemental life insurance (the "STM Supplemental Policy"), so that the total insured amount of the basic and supplemental coverage he had equaled $869,000.  The STM Policy and the STM Supplemental Policy each provide that "[t]he Policy alone is the only contract under which payment will be made."

The STM Policy further provides that unless continued under the continuation provisions – discussed below – coverage will terminate on the earliest of the following:

---

[1] Unless otherwise indicated, the parties have stipulated to the following facts (mostly in the context of the Final Pretrial Order (Doc. # 103 at 16-24)).

1) the date The Policy terminates;
2) the date You are no longer in a class eligible for coverage, or The Policy no longer insures Your class;
3) the date the premium payment is due but not paid;
4) the date Your Employer terminates Your employment; or
5) the date You are no longer Actively at Work.

The STM Policy contains the following provision for **continuation** of coverage under

the policy:

> *Can my coverage and coverage for my Dependents be continued beyond the date it would otherwise terminate?*
>
> Coverage can be continued by Your Employer beyond a date shown in the Termination provision, if Your Employer provides a plan of continuation which applies to all employees the same way.  Coverage may not be continued under more than one Continuation Provision.
>
> The amount of continued coverage applicable to You or Your Dependents will be the amount of coverage in effect on the date immediately before coverage would otherwise have ended.  Continued coverage:
>
> 1) is subject to any reductions in the Policy;
> 2) is subject to payment of premium;
> 3) may be continued up to the maximum time shown in the provisions; and
> 4) terminates if The Policy terminates.
>
> In no event will the amount of insurance increase while coverage is continued in accordance with the following provisions [which are discussed in Section III.B.1., *infra*].  In all other respects, the terms of Your coverage and coverage for Your Dependents remain unchanged.

The basic and supplemental certificates of insurance contain the same provisions.

The STM Policy also contains a separate provision for **conversion** of the policy

to an individual policy:

> If Life Insurance coverage or any portion of it under The Policy ends for any reason, You and Your Dependents may have the right to convert the coverage that terminated to an individual conversion policy without providing Evidence of Insurability.  Conversion is not available for:

     1)  the Accidental Death and Dismemberment Benefits; or
     2)  any Amount of Life Insurance for which You or Your Dependents
        were not eligible and covered; under The Policy.

If coverage under The Policy ends because:

     1)  The Policy is terminated; or
     2)  Coverage for an Eligible Class is terminated;

Then You or Your Dependent must have been insured under The Policy
for 5 years or more, in order to be eligible to convert coverage.  The
amount which may be converted under these circumstances is limited
to the lesser of:

     1)  $2,000; or
     2)  the Life Insurance Benefit under The Policy less any Amount of Life
        Insurance for which You or Your Dependent may become eligible
        under any group life insurance policy issued or reinstated within 31
        days of termination of group life coverage.

If coverage under The Policy ends for any other reason, the full amount of
coverage which ended may be converted.

To elect coverage under the conversion provision, the employee must complete a notice

of conversion right form, have it signed by the employer, and return it within 31 days

after life insurance terminates, or 15 days from the employer's signature, whichever is

later.  The insurer then verifies coverage and sends a conversion policy proposal which

must be returned with the required premium.  The individual policy becomes effective

the 32nd day after the coverage ends.  The STM Policy further provides that the

conversion policy will be issued on a form customarily used for an individual of the

employee's age and for the amount requested, with premiums based on the insurer's

rates in effect for a new applicant of the employee's class and age at the time of the

conversion.  However, the conversion policy does not provide the same terms and

conditions of coverage as the STM Policy, any benefit other than life insurance, or term insurance.  Conversion is not available for any amount of life insurance being continued under the continuation provisions (discussed above) or being insured under the portability provision (discussed below).  The STM Policy states:

> **Death within the Conversion Period:**  *What if I or my Dependents die before coverage is converted?*
>
> We will pay the deceased person's Amount of Life Insurance You would have had the right to apply for under this provision if:
>
> 1) coverage under The Policy terminates;
> 2) You or Your Dependent die within 31 days of [the] date coverage terminates; and
> 3) We receive Proof of Loss.
>
> If the Conversion Policy has already taken effect, no Life Insurance Benefit will be payable under The Policy for the amount converted.

The STM Policy contains another separate provision for **portability** benefits, defined as "a provision which allows You and Your Dependents to continue coverage under a Group Portability policy when coverage would otherwise end due to [certain[2]] Qualifying Events."  Qualifying Events under the portability provision are termination of employment prior to normal retirement age or the end of membership in an eligible class.  The STM Policy provides the following process for electing portability:

> You may elect Portability for Your coverage after Your Basic coverage ends because You had a Qualifying Event.  You may also elect Portability for Your Dependent coverage if Your Dependent has a Qualifying Event. The Policy must still be in force in order for Portability to be available.

---

[2] The parties did not stipulate to inclusion of the word "certain" (*see* Doc. # 103 at 5), although the policy provision includes it (Doc. # 60-1 at 12).  Nonetheless, the omission appears both unintentional and, ultimately, irrelevant.

In order for Dependent Child coverage to be continued under this provision, You or Your Spouse must elect to continue coverage.

To elect Portability for Your or Your Dependents, You must:

1)  complete and have Your Employer sign a Portability application; and
2)  submit the application to Us, with the required premium.

This must be received within:

1)  31 days after Life Insurance terminates; or
2)  15 days from the date Your Employer signs the application;

whichever is later.  However, Portability requests will not be accepted if they are received more than 91 days after Life Insurance terminates.

After We verify eligibility for coverage, We will issue a certificate of insurance under a Portability policy.  The Portability coverage will be:

1)  issued without Evidence of Insurability;
2)  issued on one of the forms then being issued by Us for Portability purposes; and
3)  effective on the day following the date Your or Your Dependent's coverage ends.

The terms and conditions of coverage under the Portability policy will not be the same terms and conditions that are applicable to coverage under The Policy.  This group certificate shall include a conversion privilege.

The STM Policy's portability provision allows portability of 50%, 75%, or 100% of the amount of life insurance which is ending, subject to a maximum of $250,000 for the employee.  The STM Policy states specifically that portability is not available for any amount of life insurance continued in accordance with the conversion right or the continuation provisions.[3]

---

[3] The STM Supplemental Policy contains provisions parallel to the STM Policy for continuation and conversion of coverage, but it does not contain any provision for portability of benefits.

**B.    SEVERANCE FROM STM AND AFTERMATH**

Mr. Wellinger entered into a written severance agreement with STM.  The agreement bears a date of August 27, 2008.  However, Mr. Wellinger executed the agreement on September 15, 2008, and the agreement states that he is voluntarily terminating his employment with STM as of September 26, 2008.  STM's termination form for Mr. Wellinger likewise lists his termination date as September 26, 2008.

On October 1, 2008, Mr. Wellinger exchanged emails with an STM employee, Christie Laurie, whom the parties discuss as representing STM's position regarding Mr. Wellinger's life insurance options.  (*See* Doc. ## 60 at 7; 90 at 5.)  Although Plaintiffs dispute Defendant's summation of the content of those emails, Plaintiffs cite to the emails, thereby acknowledging they occurred.  (*See* Doc. # 90 at 5.)  In the emails, Mr. Wellinger raised the issue of what it would cost to convert his policy versus pursuing the Portability option.  (Doc. # 60-6 at 1 (explaining that "[t]hey will only let me convert from term insurance to Whole Life and the cost is $15,400 per quarter[,]" and noting that "[e]ven the $250K port is $120 per month").)

Thereafter, Mr. Wellinger completed an enrollment form for a Portability policy ("the Portability Policy").  In the part of the form that he completed, Mr. Wellinger states that he is not converting any portion of the coverage he had which terminated.  The enrollment form for the Portability Policy states that "[y]our prior group beneficiary designations do not apply to this coverage" and requires the applicant to "identify the designated beneficiaries for all persons applying for coverage, except dependent children."  Mr. Wellinger designated the 1998 Wellinger Family Trust as his sole

beneficiary on that form.  Just above the signature block, where Mr. Wellinger signed, the enrollment form states, "I understand that no coverage will become effective until the enrollment form and premium amount has been approved and premiums have been received by Hartford Life and Accident Insurance Company."  Defendant asserts, and the enrollment form confirms, that Mr. Wellinger dated the form as October 15, 2008, and that his "Date Last Worked" is listed as September 26, 2008.  (Doc. # 60-7 at 2, 5.)

With the enrollment form, Mr. Wellinger submitted a check, dated October 14, 2008, in the amount of $360.00.  The policyholder named in the Portability Policy is the Trustees of Hartford Group Insurance Trust.  The Portability Policy states that coverage is reduced by 75% on the date the insured reaches age 65 and terminates the date the insured reaches age 75.  The Portability Policy does not include Accidental Death and Dismemberment benefits.  Defendant's internal documents show a Portability Effective Date of October 28, 2008.  (Doc. # 60-10.)  Plaintiffs' dispute the accuracy of that date but do not dispute that the documents list the date asserted by Defendant.  (*See* Doc. # 90 at 5.)  The Portability Policy shows a policy number of 99504.  (Doc. # 60-9.)

Defendant asserts that, also on October 15, 2008, Mr. Wellinger submitted an application to another company, Phoenix, for life insurance in the amount of $869,000 and that, on the application form, Mr. Wellinger indicated that his STM Policy was still in effect in the amount of $869,000.  (Doc. # 60 at 10.)  A review of the Phoenix application confirms Defendant's assertion.  (*See* Doc. # 60-12 at 3.)  Plaintiffs "admit the existence of the document but deny the accuracy of information stated therein" (Doc. # 90 at 6), although Plaintiffs do not identify what information is inaccurate (*see id.*).  Regardless,

8

they state that the Phoenix application "shows the Wellingers thought in October 2008 they should still have $869,000 in coverage." (*Id.*)

On November 11, 2008, Defendant forwarded to Mr. Wellinger a letter which stated, in part:

> Please find enclosed a life insurance booklet-certificate evidencing your coverage as recently requested.  You will receive bills at quarterly intervals for this coverage.
>
> You will have the right to examine this policy for ten days.  If you have questions please call the Customer Service Number provided.  We want you to be satisfied with the policy you purchased.  We urge you to examine it closely.  If, for any reason, you are not satisfied, you may return the policy to us within ten days after you receive it.  It will be cancelled and any premium you paid will be refunded in full.

Mr. Wellinger did not return the Portability Policy or request a refund.

The Portability Policy contains a single exclusion which states, "No benefit will be paid if death is due to suicide unless such suicide occurs after the Participant's insurance has been in force for 2 years under the Group Insurance Policy."[4]

On September 9, 2009, Mr. Wellinger died in Boulder County, Colorado, of a self-inflicted gunshot wound, which the coroner ruled a suicide.[5]  On September 23, 2009, Julie Wellinger provided notice to Hartford of her husband's death and requested information on insurance benefits.  Such notice, sent through counsel, stated in pertinent part: "Upon receipt of this letter, please provide information to our office as it

---

[4] Defendant concedes that, "[u]nder Colorado law, the 2-year suicide exclusion is reduced to 1 year."  (Doc. # 60 at 9 (citing Colo. Rev. Stat. § 10-7-109).)

[5] Plaintiffs "deny Mr. Wellinger's death was a suicide" (Doc. # 90 at 6), but they contest neither the manner of death nor that the coroner concluded Mr. Wellinger had committed suicide (*see id.*).

relates to any and all policies owned by Mr. Wellinger, as well as instructions regarding the payment of any available benefits."  On October 19, 2009, Hartford forwarded to Julie Wellinger's attorney the Hartford form for filing a claim under the Portability Policy.

Hartford denied the subsequently submitted claim, determining that, because the manner of Mr. Wellinger's death was ruled a suicide, his death was not a covered loss under the terms of the Portability Policy.  On April 6, 2010, Julie Wellinger appealed Hartford's denial of death benefits,[6] and on June 9, 2010, Hartford upheld its decision to deny the claim for benefits.

Plaintiffs commenced this case on September 8, 2011, in Boulder County District Court.  (Doc. # 2.)  Defendant successfully removed it here on September 30, 2011. (Doc. # 1.)  Plaintiffs filed an Amended Complaint on April 23, 2012.  (Doc. # 27.) Plaintiffs brought five claims: (1) breach of contract; (2) bad faith breach of contract; (3) statutory bad faith under Colo. Rev. Stat. § 10-3-1115; (4) violation of 29 U.S.C. § 1132; and (5) an "alternative" breach of contract claim.  (*See id.*)  On February 1, 2013, the parties jointly moved to have the Court dismiss Plaintiffs' third claim (Doc. # 55), which the Court did on February 5, 2013 (Doc. # 56).  Defendant filed the instant motion on February 14, 2013 (Doc. # 60), which is ripe for review.[7]

---

[6] The appeal letter, again sent through counsel, states in relevant part: "As a part of the group policy [with STM], Mr. Wellinger was provided the insurance in the basic amount of $394,000, which was later supplemented in the amount of $475,000, for a total coverage amount of $869,000.  Said life insurance was procured by Mr. Wellinger on May 17, 1985, in the amount of $394,000, and was supplemented on January 1, 1998, in the amount of $475,000.  Pursuant to Hartford's portability policies, Mr. Wellinger converted the policy in the total eligible amount of $250,000, on October 15, 2008 . . . ."  (Doc. # 60-19 at 1.)
[7] Plaintiffs' May 31, 2013 response is located at Doc. # 90 in the record, and Defendant's June 14, 2013 reply is at Doc. # 95.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs.*, *Inc.,* 259 F.3d 1226, 1231–32 (10th Cir. 2001).  A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okl.*, 119 F.3d 837, 839 (10th Cir. 1997).  As mentioned above, when reviewing motions for summary judgment, courts must view the evidence in the light most favorable to the non-moving parties. *Id.*  However, conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating an absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.  *Id.*  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  *Adler*, 144 F.3d at 671.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."  *Id.*

### III.  DISCUSSION

To facilitate resolution of Defendant's motion, the Court will take up Plaintiffs' claims in a slightly different order than that in which they were pled, beginning first with Plaintiffs' two breach of contract claims.

### A.  WHETHER JULIE WELLINGER IS A PROPER PLAINTIFF IN HER INDIVIDUAL CAPACITY

As an initial matter, though, the Court will address Defendant's contention that Julie Wellinger is not a proper plaintiff in this action.  (Doc. # 60 at 11.)  Generally, "only parties to [an] insurance contract or [their] named beneficiaries have standing to enforce the contract or to recover extra-contractual damages for wrongful withholding of benefits."  *Grant v. State Farm Life Ins. Co.*, No. CIV. S-05-2389, 2007 WL 3119738, at *4 (E.D. Cal. Oct. 23, 2007) (unpublished).  In the instant case, Mr. Wellinger was the insured party, and the Trust was named as his sole beneficiary.  Thus, the Trust is the only proper plaintiff in this action.  This result is not altered by Julie Wellinger's assertion that she is a beneficiary of the Trust.  (Doc. # 90 at 21.)  Incidental beneficiaries to an insurance contract, such as Julie Wellinger here, do not have standing to sue under the contract.  *See* Restatement 2d Contracts § 302; *Grant*, 2007 WL 3119738, at *4.

Accordingly, Defendant is entitled to summary judgment on its argument that Julie

Wellinger should be dismissed from this action in her individual capacity.

**B.      PLAINTIFFS' BREACH OF CONTRACT CLAIMS**

Plaintiffs' first and fifth claims are for breach of contract.  (Doc. # 27 at 7-9, 14.)

As best the Court can tell, the former claim pertains to the STM Policy and the STM

Supplemental Policy, while the latter claim relates to the Portability Policy.  The Court

will address the claims as such, in turn, below.

1.      Claim One: Breach of the STM Policy  and the STM Supplemental Policy

Plaintiffs first assert that they are "the lawful designated beneficiaries of the life

insurance referenced above [*i.e.*, that contained in the STM Policy and the STM

Supplemental Policy] for the full coverage amount required or applicable, $869,000 . .

. ."  (Doc. # 27 at 7.)  Plaintiffs' argument is unavailing because, by the time Mr.

Wellinger died, coverage under both the STM Policy and the STM Supplemental Policy

had long since terminated.

When a contract's language "unambiguously resolves the parties' dispute, the

interpreting court's task is over," because "in the absence of an ambiguity a written

contract cannot be varied by extrinsic evidence."  *Level 3 Commc'ns, LLC v. Liebert*

*Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008).  However, when the court has determined a

contract to be ambiguous, "the meaning of its terms is generally an issue of fact to be

determined in the same manner as other factual issues."  *East Ridge of Fort Collins,*

*LLC v. Larimer & Weld Irr. Co.*, 109 P.3d 969, 974 (Colo. 2005).  An insurance contract

is ambiguous if it is "fairly susceptible" to more than one interpretation.  *Level 3*

*Commc'ns*, 535 F.3d at 1154.  "Whether a contract is ambiguous is a question of law."

*MemoryTen, Inc. v. LV Admin. Servs., Inc.*, --- F.Supp.2d ----, 2013 WL 1828305, at *9

(D. Colo. April 30, 2013).

In the instant case, the parties agree the STM Policy and the STM Supplemental

Policy both state that, unless continued under the continuation provisions, insurance

coverage will terminate on the earliest of the following:

1) the date The Policy terminates;
2) the date You are no longer in a class eligible for coverage, or The Policy
   no longer insures Your class;
3) the date the premium payment is due but not paid;
4) the date Your Employer terminates Your employment; or
5) the date You are no longer Actively at Work.

Although the parties dispute which of those events happened first – an issue the Court

will address later in this Order – no disagreement exists that by at least September 26,

2008, Mr. Wellinger's employment with STM had terminated.  Thus, his insurance

coverage terminated then,[8] too, unless it continued under the provisions specified by

the policies.

Both policies list, with identical language, the following five continuation

provisions:

> <u>Leave of Absence</u>: If You are on a documented leave of absence, other
> than Family and Medical Leave or Military Leave of Absence, Your
> coverage (including Dependent Life coverage) may be continued for 12
> month(s) after the month in which the leave of absence commenced.  If
> the leave terminates prior to the agreed upon date, this continuation will
> cease immediately.

---

[8] In the text below, the Court will address Defendant's assertion that Mr. Wellinger's coverage
was actually subject to a 31-day grace period; however, resolution of that question does not
materially affect the issue being addressed here.

Military Leave of Absence: If You enter active military service and are granted a military leave of absence in writing, Your coverage (including Dependent Life coverage) may be continued for up to 12 month(s).  If the leave ends prior to the agreed upon date, the continuation will cease immediately.

Disability Insurance: If You are working for the Policyholder and:
    1)  are covered by; and
    2)  meet the definition of disabled under;
a Group Disability Insurance Policy, Issued by Us to Your Employer, Your coverage (including Dependent Life coverage) may be continued until the last day of the 12th month after the month in which You became disabled, as defined in the Group Disability Insurance Policy.

Sickness or Injury: If You are not Actively at Work due to sickness or injury, all of Your coverages (including Dependent Life coverage) may be continued:
    1)  for a period of 12 consecutive month(s) from the date You were last Actively at Work; or
    2)  if such absence results in a leave of absence in accordance with state and/or federal family and medical leave laws, then the combined continuation period will not exceed 12 consecutive month(s).

Family Medical Leave: If You are granted a leave of absence, in writing, according to the Family and Medical Leave Act of 1993, or other applicable state or local law, Your coverage(s) (including Dependent Life coverage) may be continued for up to 12 weeks, or longer if required by other applicable law, following the date Your leave commenced.  If the leave of absence terminates prior to the agreed upon date, this continuation will cease immediately.

(Doc. ## 60-1 at 7; 60-2 at 13-14.)  Neither policy lists any other continuation provisions.

Plaintiffs assert that, despite the absence of additional continuation provisions in the policies, "no limiting words appear in the Policy certificates that would restrict continuation to five short-term leave events."  (Doc. # 90 at 4.)  However, following a long line of authority (*see* Doc. # 95 at 21 (citing cases)), the Court determines that the inclusion of a specific list of continuation provisions in the policies, with no

accompanying statement that such list is non-exclusive, is properly interpreted as

excluding anything not listed.  *See, e.g.*, *Elliott v. Joyce*, 889 P.2d 43, 46 (Colo. 1994)

("expression in a contract of one or more things of a class implies exclusion of all not

expressed").  Accordingly, the plain and unambiguous language of the STM Policy and

the STM Supplemental Policy indicate that continuation of insurance coverage does not

arise without one of the five enumerated continuation provisions first having been met.

Plaintiffs do not dispute that Mr. Wellinger failed to satisfy any of those provisions.

Mr. Wellinger's employment terminated by at least September 26, 2008, and STM

did not continue his insurance under any of the continuation provisions.  Therefore,

coverage under the STM Policy and the STM Supplemental Policy terminated long

before Mr. Wellinger's death the following year and, thus, his death was not covered

by either policy.

This eventuality is supported by the sequence of events following Mr. Wellinger's

death.  After his death, Plaintiffs never applied for benefits under the STM Policy or the

STM Supplemental Policy.  To be sure, when Julie Wellinger apprised Defendant of her

husband's death, she requested information "as it relates to any and all policies owned

by Mr. Wellinger, as well as instruction regarding the payment of any available benefits."

Thereafter, however, no claim for benefits under the STM Policy or the STM

Supplemental Policy was submitted.  And when Julie Wellinger appealed Defendant's

denial of benefits, she explicitly stated that, "[p]ursuant to Hartford's portability policies,

Mr. Wellinger converted[9] the policy in the total eligible amount of $250,000 . . . ."  Such

actions of course make sense, given that coverage under the STM Policy and the STM

Supplemental Policy terminated well before Mr. Wellinger's death, as previously

explained.

Further, in addition to demonstrating that coverage under the STM Policy and the

STM Supplemental Policy terminated before Mr. Wellinger's death, the failure to seek

benefits under those policies by itself precludes relief under such policies.  Plaintiffs

stipulated that the STM Policy is part of an ERISA plan.  Accordingly, Plaintiffs would

have been required to have exhausted administrative remedies before bringing suit to

obtain benefits under the policy.  *See, e.g.*, *McGraw v. Prudential Ins. Co. of Am.*, 137

F.3d 1253, 1263 (10th Cir. 1998) (noting that the exhaustion of administrative remedies

is an implicit prerequisite to seeking judicial relief under ERISA).  No facts indicate that

they have done so.

Nor are Plaintiffs entitled to relief based on their insistence that STM's employees

"were told that they could keep their life insurance coverage for the full amount when

they left their employer."  (Doc. # 90 at 26.)  In support of this assertion, Plaintiffs merely

point to some "Benefit Highlights" materials pertaining to the STM Policy and the STM

Supplemental Policy.  (Doc. ## 90-15; 90-16.)  These materials state that, "subject to

the contract, you have the option of continuing your . . . coverage at your own expense.

Please refer to your benefit booklet for specific benefit details and limitations."  (Doc.

---

[9] Despite the inconsistency of using "converted" with "Hartford's portability policies," the context
of the letter, in particular her reference to a $250,000 policy, indicates that Julie Wellinger was
referring to her husband having opened the Portability Policy.

## 90-15 at 2; 90-16 at 2.)  The "contract," as already discussed, explained that an individual could choose to remain insured by either converting the policy, which Plaintiffs admit Mr. Wellinger did not do (Doc. # 90 at 21), or entering a Portability policy, which Mr. Wellinger clearly did.  Moreover, to the extent that any confusion arose from Defendant's choice of words – "continuing your . . . coverage" (those words appear to have been employed colloquially based on the context in which they were used) – a summary description of a benefit plan cannot trump the express language of the applicable insurance policy especially where, as here, the summary cautions that it is limited by the terms of the contract.  *See, e.g.*, *Broderick Inv. Co. v. Strand Nordstrom Stailey Parker, Inc.*, 794 P.2d 264, 266 (Colo. App. 1990) (insurance certificate is informational only and does not alter the terms of the insurance policy).

Similarly, merely because Mr. Wellinger "expected to continue the full insurance" and "wanted his full term life coverage" to continue (Doc. # 90 at 29) does not result in an extension of his coverage.  Although Plaintiffs correctly assert that insurance contracts are construed to "ensure that reasonable expectations of an ordinary individual purchasing the contract will be fulfilled," *Carroll v. CUNA Mut. Ins. Soc.*, 894 P.2d 746, 749-50 (Colo. 1995), the Court's interpretive task ends when, as here, the language being construed is unambiguous, *see Level 3 Commc'ns*, 535 F.3d at 1154. Agreeing with Plaintiffs' argument would essentially allow any STM employee the ability to continue his or her coverage when terminated from employment based on a subjective expectation of continued benefits, despite the explicit language of the policies which plainly state that coverage "can be continued by Your Employer" subject to the

enumerated continuation provisions discussed above.  (Doc. ## 60-1 at 6-7; 60-2 at 13-14.)

Accordingly, Defendant is entitled to summary judgment on Plaintiffs' first claim.

2.   <u>Claim Five: Breach of the Portability Policy</u>

Plaintiffs argue, in the alternative, that Defendant is liable for breach of contract under the Portability Policy.  (Doc. # 27 at 14.)  However, their arguments here fare no better than under their initial breach of contract claim.

a)   *Whether Mr. Wellinger committed suicide*

As a threshold matter, though, the Court addresses Plaintiffs' assertion that "[w]hile [Mr. Wellinger's] death certificate indicates 'suicide,' the known facts demonstrate that this is a matter in genuine dispute."  (Doc. # 90 at 31.)  If Defendant's stated reason for denying death benefits were genuinely in dispute, then this breach of contract claim would survive, irrespective of the merits of the other arguments Plaintiffs advance.  As it turns out, however, the Court finds insufficient factual support for a good faith assertion that Mr. Wellinger did not commit suicide.

Plaintiffs' assertion is based, in part, on a Legal Blood Alcohol assay and a Drug Abuse screen which were performed on a postmortem urine sample.  (Doc. # 90 at 31.) However, Plaintiffs fail to cite any authority indicating that an individual cannot commit suicide when his blood alcohol content is at a particular level.  Plaintiffs also argue that, in addition to Mr. Wellinger's intoxication, to which Julie Wellinger testified (Doc. # 90-8), Mr. Wellinger apparently: had not expressed suicidal ideations; did not leave a suicide note; was suffering from stress and depression; and was receiving medical care for

mood-related mental health issues.[10]  (Doc. # 90 at 32.)  Plaintiffs also rely on a legal

"presumption against suicide." (*Id.* (citing *Horton v. Reliance Standard Life Ins. Co.*, 141

F.3d 1038, 1041 (11th Cir. 1998)).)

Beginning first with the legal presumption against suicide, even *Horton* notes

that the presumption is rebuttable by contrary evidence.  141 F.3d at 1041; *see, e.g.*,

*Indust. Comm'n of Colo. v. Peterson*, 377 P.2d 542, 545 (Colo. 1963) (explaining that

the presumption against suicide can be overcome by substantial evidence to the

contrary).  Plaintiffs' assertion that Mr. Wellinger was not experiencing suicidal ideation

is contradicted by substantial evidence, including: the self-inflicted gunshot wound; the

coroner's report; and the evidence the coroner relied upon (*see* Doc. # 97, *filed under

seal*).  Further, Plaintiffs fail to explain, and certainly provide no evidence elucidating,

what significance, if any, the Court should attach to the absence of a suicide note.

Although the lack of such a note might suggest a cause of death other than suicide,

that conclusion would be supported here only by speculation, not empirical evidence.

Finally, and perhaps most importantly, Julie Wellinger admitted during her deposition

that two of the other carriers through which Mr. Wellinger had life insurance denied

coverage pursuant to the suicide exclusions in their respective policies.  Yet, suit was

not filed against them because, as Julie Wellinger said with reference to a State Farm

policy, "the coroner's official report said suicide, and that that [*sic*] was an exclusion in

---

[10] Plaintiffs fail to articulate how Mr. Wellinger' alleged stress, depression, and mood disorder
support their position that he did not commit suicide; to the Court's mind, such realities seem
to correlate well with, if not often cause, suicidal occurrences.

the policy." (Doc. # 95-1 at 5.)  Accordingly, the Court determines that no genuine

dispute exists with regard to the fact that Mr. Wellinger committed suicide.

> b)   *When the suicide exclusion began to run*

Plaintiffs' principal argument is that Mr. Wellinger was "no longer Actively at

Work" as of August 23, 2008 (or August 27, 2008 at the latest) and that, therefore, his

coverage under the Portability Policy became effective the following day.  (Doc. # 90 at

24, 30.)  This argument is unpersuasive for at least the following three reasons.

First, Plaintiffs have offered no evidence even remotely indicating that Defendant

knew, or should have known, that Mr. Wellinger was not actively at work beyond the end

of August, assuming such an assertion is true.  Nor have they cited to any authority

suggesting that Defendant was required to conduct an investigation into Mr. Wellinger's

last day at work, especially in light of the fact that the enrollment form Mr. Wellinger

signed listed his "Date Last Worked" as September 26, 2008 (Doc. # 60-7 at 2), which

also coincided with the September 26, 2008 termination date shown in Mr. Wellinger's

executed severance agreement (Doc. # 60-4 at 1).  Second, the enrollment form for

the Portability Policy explicitly states that "no coverage will become effective until the

enrollment form and premium amount has been approved and premiums have been

received by Hartford Life and Accident Insurance Company."  (Doc. # 60-7 at 5.)

Mr. Wellinger's corresponding check, in the amount of $360.00, was not dated until

October 14, 2008 (Doc. # 60-8), which means, according to the enrollment form, that

coverage under the Portability Policy could not have commenced prior to that day.

Third, even if Mr. Wellinger was no longer actively at work as of August 23, 2008,

he continued to be covered for 31 days under the STM Policy before the Portability

Policy took effect, as evidenced by the 31 day period explicitly mentioned in the

Portability provision of the STM Policy.  (Doc. # 60-1 at 17.)  This grace period, as

Defendant explains, allows time for its outgoing employees to either convert their

policies or to enroll in a Portability policy.[11]  (Doc. ## 95 at 29; 95-7 at 4.)  Thus, even

crediting Plaintiffs' assertion regarding Mr. Wellinger's last day of work, his coverage

under the Portability Policy still would have commenced less than one year before his

September 9, 2009 suicide.[12]

Mounting a slightly different attack, Plaintiffs also argue, at least implicitly, that

the effective date for the Portability Policy should relate back to Mr. Wellinger's initial

coverage with STM because, according to Plaintiffs, the Portability Policy does not

constitute a "new or 'different' policy."  (Doc. # 90 at 30.)  However, this argument fails

in light of the evidence Defendant has tendered.  To begin with, as set forth above,

the STM Policy clearly states that "[t]he terms and conditions of coverage under the

Portability policy will not be the same terms and conditions that are applicable to

coverage under The [STM] Policy."  This warning is borne out in comparing the STM

---

[11] Given this commonsense explanation, the Court rejects Plaintiffs' argument that "[n]o such period would work to the advantage of the Wellinger family."  (Doc. # 90 at 31.)  Plaintiffs would likely reevaluate their argument had Mr. Wellinger died of natural causes in the 31-day period between September 26, 2008, and October 28, 2008.  As Defendant puts it, "Plaintiffs can't have it both ways."  (Doc. # 95 at 31.)

[12] That Mr. Wellinger was aware of his coverage under the 31-day grace period is evidenced by his decision to wait until October 15, 2008, to complete the enrollment form for the Portability Policy.  (*See* Doc. # 60-7 at 5.)  Similarly, in his October 15, 2008 application to Phoenix, Mr. Wellinger indicated that his STM coverage was still in effect.  (Doc. # 60-12 at 3.)  Moreover, according to the STM Policy, itself, Mr. Wellinger would have been unable to enter a Portability policy had the STM Policy no longer been in force.  (*See* Doc. # 60-1 at 12 ("The [STM] Policy must still be in force in order for Portability to be available.").)

Policy with the Portability Policy.  Most importantly for this case is that the Portability Policy included a suicide exclusion, while the STM Policy had not.[13]  Additionally, the Portability Policy entailed a new enrollment form, new policy number, and a new designation of beneficiaries.  Further, as compared to the STM Policy, the Portability Policy had a different policyholder, different effective date, and a different insured amount.  Also, when Defendant sent Mr. Wellinger the life insurance booklet-certificate for the Portability Policy, it advised him to read the policy stating, "We urge you to examine it closely."  These facts convince the Court that, contrary to Plaintiffs' argument, the Portability Policy did constitute a new and different policy for Mr. Wellinger.

This result accords with the Tenth Circuit's opinion in *Binkley v. Manufacturers Life Ins. Co.*, 471 F.2d 889 (10th Cir. 1973), where the court dealt with the analogous issue of when a suicide exclusion in a conversion policy began to run.  The *Binkley* court determined that the exclusion commenced when the insured entered into the conversion policy, reasoning, in pertinent part, that "the group policy contained no suicide clause, whereas the individual policy did" and "the coverage afforded the insured [under the group policy] was $12,000, whereas the coverage afforded under the individual policy was $15,000."  *Id.*  Because of these differences, the court declared, "it is clear to us . . . that the individual policy issued the insured was a different policy than the group policy which covered him during his employment."  *Id.*; *accord Brindis v. Mut. Life Ins. Co.*, 560 N.E.2d 722, 723 (Mass. App. Ct. 1990) (noting that, in determining whether a suicide exclusion in a conversion policy dates back to

---

[13] Other differences emerge when the policies are compared, such as the Portability Policy's reduction of coverage at age 65 and elimination of coverage at age 75.

issuance of the original policy, courts often look to see "whether the terms of the substituted policy are sufficiently similar to those of the original or master policy to be regarded as a continuation of coverage").

Accordingly, being separate and distinct from the STM Policy and the STM Supplemental Policy, the Portability Policy and its attendant suicide exclusion therefore began to run on October 28, 2008.  This conforms to the language of the exclusion itself, which says that no benefit will be paid if the insured commits suicide within the time specified "under **this** Group Insurance Policy."  (Doc. # 60-9 at 10 (emphasis added).)  Having gone into effect at that time, the suicide exclusion prohibited Mr. Wellinger's September 9, 2009 suicide from being covered by the policy.

Thus, Defendant is entitled is entitled to summary judgment on Plaintiffs' fifth claim.

## C.   REMAINING CLAIMS

Neither of Plaintiffs' two remaining claims – for bad faith breach of insurance contract and violation of 29 U.S.C. § 1132 – has merit and, accordingly, the Court will address them in an abbreviated manner.

### 1.   Bad Faith Breach of Insurance Contract

To establish the tort of bad faith breach of an insurance contract, the plaintiff must show that the defendant insurer "acted unreasonably and with knowledge of or reckless disregard for the fact that no reasonable basis existed for denying the claim." *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274 (Colo. 1985); *Pham v. State Farm Mut. Auto. Ins. Co.*, 70 P.3d 567, 572 (Colo. App. 2003).  The determination of whether an

insurer has committed a bad faith breach of its duties "is one of reasonableness

under the circumstances." *Pham*, 70 P.3d at 572.  The plaintiff bears the burden of

establishing "the insurer's knowledge or reckless disregard of the fact that a valid claim

has been submitted."  *Id.*  This standard of care "reflects a reasonable balance between

the right of an insurance carrier to reject a non-compensable claim" and "the obligation

of such carrier to investigate and ultimately approve a valid claim" that has been

submitted.  *Savio*, 706 P.2d at 1275.  In reviewing a bad faith claim, "the

reasonableness of an insurer's conduct is measured objectively based on industry

standards."  *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011).

Under Colorado law, what constitutes reasonableness under the circumstances is

ordinarily a question of fact for the jury.  *Bankr. Estate of Morris v. COPIC Ins. Co.*, 192

P.3d 519, 524 (Colo. App. 2008).  In appropriate circumstances, however, "as when

there are no genuine issues of material fact, reasonableness may be decided as a

matter of law." *Zolman*, 261 P.3d at 497 (citing *Bankr. Estate of Morris*, 192 P.3d at

524).

    In the instant case, as previously discussed, the undisputed facts demonstrate

that Plaintiffs did not submit a valid claim, and Defendant addressed the claim in

an appropriate manner.  Coverage under Mr. Wellinger's STM Policy and STM

Supplemental Policy terminated long before his death and, because his suicide

occurred within one year of when the Portability Policy took effect, that policy's suicide

exclusion prevented benefits from being paid under the policy.  Thus, Plaintiffs cannot

establish that Defendant acted unreasonably or with reckless disregard.  Accordingly,

summary judgment in Defendant's favor on Plaintiffs' bad faith claim is appropriate.

2.   ERISA Claim

Plaintiffs' final claim arises pursuant to 29 U.S.C. § 1132, which is a civil

enforcement provision under ERISA.  (Doc. # 27 at 12-13.)  As explained in Section

III.B.1., *supra*, Plaintiffs stipulated that the STM Policy was part of an ERISA plan.

But that policy did not cover Mr. Wellinger at the time of his death, nor were benefits

sought under it.  In any event, Plaintiffs have put forth no evidence indicating that they

exhausted administrative remedies before filing this action.  As such, they are precluded

from seeking judicial relief under ERISA for this claim.  *See McGraw*, 137 F.3d at 1263.

Thus, Defendant is entitled to summary judgment on Plaintiffs' fourth claim.

## IV.  **CONCLUSION**

For the foregoing reasons, it is ORDERED that Defendant Hartford Life and

Accident Insurance Company's Motion for Summary Judgment (Doc. # 60) is

GRANTED.  It is

FURTHER ORDERED that: the Final Trial Preparation Conference, set for

December 6, 2013; the December 9, 2013, Jury Selection; and the five-day Jury Trial,

set to begin on December 16, 2013, are VACATED.  It is

FURTHER ORDERED that Defendant shall have its costs by the filing of a Bill

of Costs with the Clerk of the Court within 10 days of the entry of judgment.  However,

each party shall bear its own attorney fees.  Finally, it is

FURTHER ORDERED that this case is DISMISSED in its entirety.

DATED:  September __24__, 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge